## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re Bryan Douglas Kimmell,<br><br>Debtor.<br><br>------------------------------------------------------<br><br>Joseph R. Voiland, Trustee,<br><br>Plaintiff,<br><br>v.<br><br>Gale S. Kimmell,<br><br>Defendant. | Bankruptcy No.  10-B-36039<br>Adversary No. 10-A-02174<br>Chapter 7<br>Judge Manuel Barbosa |

## MEMORANDUM OPINION

The Chapter 7 Trustee filed an adversary proceeding against the Debtor's ex-wife seeking to avoid an unequal division of property under a marital settlement agreement signed 1.5 years before the Debtor's petition date as a fraudulent transfer. For the reasons stated below, the Trustee failed to meet his burden of demonstrating that the unequal division constituted a fraudulent transfer, and therefore judgment will be entered in favor of the Defendant.

## I.  JURISDICTION AND PROCEDURE

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).

## II.  FACTS AND BACKGROUND

The following facts and procedural history are taken from the Amended Complaint and Answer thereto, and from the testimony and exhibits presented and admitted into evidence at the trial held July 12, 2012.

Bryan and Gale Kimmell were married in 1981. Both spouses worked during their marriage, though during the majority of their marriage Bryan earned a higher income. Gale worked first as a teacher and then at a computer company. Bryan worked for most of his career in the financial markets before radically changing careers and trying his hand at running a restaurant a few years before his bankruptcy petition. He worked at the Chicago Mercantile Exchange for about fifteen years ending in 1998, at which time he earned a total annual income of over $150,000.  In 1999, he quit the trading floor to form an energy consulting firm, which he operated until 2007.  His firm was successful, but he earned significantly less than he had on the trading floor. In 2006, he started the restaurant, to which he devoted his full attention, ceasing to actively run the consulting firm by 2007.

Bryan had been approached by a friend sometime in 2006 with the idea of starting a restaurant.  To do this, they formed an S Corporation, Raising Kane Corp., of which Bryan was an over 99% shareholder. Bryan and his business partner made their primary investments in the restaurant through shareholder loans to the corporation. As an initial investment, Bryan withdrew $60,000 from his and his wife's joint IRA to help fund the necessary build-out of the leased property and for other expenses to create and open the new restaurant.  Bryan informed Gale that he was withdrawing the money to start the restaurant, though they did not discuss the details. While Gale was not happy with Bryan's plan and did not agree with the decision, she did not forbid him from

using the money in that way. Gale thought Bryan was better suited to the financial industry and was too easily swayed by his friend's idea. She also indicated from the beginning that she did not want to have anything to do with the restaurant. In contrast, Bryan always believed the restaurant would be successful. However, the initial $60,000 investment was not enough to complete the restaurant, and Bryan took an additional $140,300 out of the IRA in March or April 2007 to further invest in the restaurant. Gale was aware of this subsequent investment as well. The restaurant opened in March 2007.

Whether because of the differences in opinion over Bryan's foray into the restaurant business or for other reasons, Gale and Bryan's relationship began to break down irretrievably sometime in either 2006 or 2007. In 2005, they had placed their home for sale with the hope of moving together into a smaller home. But, by the time they actually sold the house in December 2007, they knew they would separate and move into separate residences. Gale testified that she thought that she first told Bryan that she was unhappy and wanted to divorce sometime in 2006, but could not remember the date. Bryan did not recall any such conversation, but noted that they were drifting apart and even started maintaining separate bank accounts by 2006 or 2007.

Bryan and Gale sold their residence on December 3, 2007, for which they received net proceeds of $477,416.57. Because they had decided by this point not to purchase a new home together, they deposited the proceeds into a joint account. They discussed the division of these proceeds and agreed that Gale should receive an extra $189,000 as compensation for the retirement funds that Bryan had invested into the restaurant. Otherwise, they generally divided the remainder of the proceeds equally or used it on joint expenses over the next year or year and a half. After

selling the house, they continued to live together in an apartment and split rent for most of 2008 until Bryan finally moved out.

It was unclear from the testimony whether the restaurant made any profits during 2007, but during all subsequent years it operated at a loss. Bryan estimated it may have lost as much as $70,000 or $80,000 in 2008, but was unsure. The corporation's tax return for 2008 was not submitted as evidence, and Bryan's individual tax return for 2008 claimed his individual share of nonpassive loss from the S corporation was $25,000. Despite the losses, Bryan continued to be optimistic about the restaurant's chances. The restaurant generated significant gross revenues and seemed to be doing better than most restaurants in the area. Bryan felt that the losses were caused by the general recession that had started at the end of 2007 and felt that if they could hold on until the general economy improved, the restaurant would be successful.

On March 31, 2009, Bryan and Gale signed a marital settlement agreement, which was subsequently approved by an Illinois divorce court and incorporated into a judgment of dissolution of marriage (the "Marital Settlement Agreement"). It was an uncontested proceeding, in which only one lawyer was involved, though the lawyer technically represented Bryan. The settlement agreement waived any right to maintenance, and Bryan and Gale had no children. At the time of the dissolution, the Kimmells had no real estate and they already had separate bank accounts and separate possession of personal property. The settlement agreement effectively gave each party ownership of the property already thus divided. Thus, Bryan was entitled to keep his two deposit accounts with balances at the time totaling $1,092, an IRA with a balance of $74,251, and a Subaru Outback worth $1,000. Gale was entitled to keep an IRA at Stiefel Nicklaus of $167,746.23, an IRA

at Vanguard of $11,000, two deposit accounts totaling $73,892.71, and a 2009 Honda Civic worth $19,975.[1] Of these easily-valued assets, the settlement agreement resulted in Bryan receiving a total of $76,343 in deposit or retirement accounts and vehicles while Gale received $272,613.90 in deposit or retirement accounts and vehicles.

Gale was in possession of more liquid assets as of March 2009 because she had received the additional $189,000 out of the proceeds of the sale of their home in 2007 and because Bryan had poured most of his share of the house sale proceeds into further investments in his unsuccessful restaurant between 2007 and 2009. Gale also testified that she had inherited the $11,000 Vanguard account from her father, that it was funded when she was young and long before she married Bryan, and that it had always been in her name. The settlement agreement also provided that each spouse was entitled to keep any other 401(k)s, IRAs or pensions owned by that spouse. At the time of the divorce, Bryan believed he was entitled to a pension from a prior job at National Westminster Bank that he believed had a cash value of around $74,000. However, about six or eight months after the divorce, Bryan tried to access the pension and learned that he had not satisfied the vesting requirements.

Under the settlement agreement, Bryan was also entitled to keep his interests in the restaurant, Raising Kane Corp., and his energy consulting firm, Strategic Energy Management Corp. By the agreement, Bryan agreed to be solely liable for any debt of the two businesses, and for two

---

[1]The Trustee also argued that a deposit of $32,898.66 into one of Gale's accounts made on July 13, 2009, must have been an asset in existence and distributed under the Marital Settlement Agreement in March 2009. However, Gale testified that should could not recall the source of that deposit or whether it was proceeds of an asset in existence in March 2009. Since the deposit could have constituted any number of post-dissolution assets, such as salary or a loan, or could have been merely a transfer from one of the other accounts already counted in this Court's calculation of assets distributed under the settlement agreement, I find that the Trustee failed to prove that this deposit constituted an additional asset distributed under the settlement agreement.

credit cards, which were primarily used for business expenses of the restaurant. Bryan was unsure what the balances on the two credit cards were at the time of the settlement agreement, but acknowledged that they could have totaled as much as $20,000.

The Trustee and the Defendant agreed that the energy consulting firm was no longer active and had no value as of March 2009, but they disputed the value of the restaurant. The balance sheet in Raising Kane Corp.'s 2009 federal tax return showed that as of January 1, 2009, the corporation had assets totaling $196,765.[2] The corporation's third party liabilities (excluding equity and shareholder loans) totaled $183,083, of which $91,000 was for mortgages, notes, and bonds payable in 1 year or more, $953 was for mortgages, notes, and bonds payable in less than 1 year, $27,727 was for "other current liabilities" and $63,403 was from a negative cash account. As for Bryan's investment in the company, the balance sheet showed $309,168 in shareholder loans as of January 1, 2009, of which Bryan testified that $80,000 was from his business partner and the remainder was his own investment. In other words, as of January 1, 2009, Bryan was owed $229,168 by the corporation on shareholder loans. According to the balance sheet, if the corporation had been liquidated as of that date, even if third party lenders were paid ahead of Brian, he could still look to a pro-rata distribution with his business partner of the remaining $13,682 in asset-value.[3]

---

[2] For purposes of this discussion, despite appearing in the "assets" portion of the balance sheet, I have disregarded the negative cash account listed in the balance sheet (presumably reflecting checks issued in excess of a deposit account balance), which I will instead treat as a liability.

[3] The only other evidence as to the value of the corporation was that in September 2009, the corporation sold certain equipment and other personal property for $125,000 in connection with a move to a new location across the street. However, that sale is not inconsistent with a finding that the assets of the restaurant as of January 2009 were at least $196,765. It was clear that the sale was not of all of the corporation's assets, including goodwill, as is evidenced by the fact that the restaurant continued as a going concern and reopened after moving to the new location across the street.

The same balance sheet showed that by the end of 2009, the corporation's assets had decreased slightly to $192,367, while its liabilities excluding equity and shareholder loans had increased dramatically to $288,535. In other words, by the end of 2009, the corporation's third party debts exceeded its assets by $96,168. This meant that not only was the likelihood of repayment to Bryan on his shareholder's loans unlikely, but to the extent he had guaranteed or was otherwise personally liable on any of the corporation's debts that it could not afford to repay, he might have to repay those debts individually.

The balance sheet does not show what proportion of the corporation's increased debt was incurred before the marital settlement agreement was signed on March 31, 2009. However, based on the Debtor's testimony, the majority of debt - but not all - was incurred after the divorce, and particularly in connection with a move across the street in September 2009. In September 2009, in the belief that the restaurant would be more successful in a location with better visibility and outdoor seating, Razing Kane Corp. sold its rights in the build-out and certain other personal property at its original location for $125,000 and moved to a new location across the street. The restaurant used about $75,000 of those proceeds to pay its landlord at the original location, and used the remainder to pay off other debts or to use towards preparing the restaurant at the new location. They still had enough equipment to start at the new location, or otherwise swapped equipment with the vacating tenants at the new location. The corporation also incurred substantial new debt to remodel the new space and to restart the business there. However, the business was ultimately not successful, and was further hurt by the fact that it was closed for several months during the move. The corporation suffered losses of $73,000 during 2009 and $40,000 or $50,000 during the beginning of 2010 before

ultimately closing at the end of April 2010.

Bryan was apparently personally liable for much of the debt incurred by the company or else used personal credit cards and loans to help fund the failing business. He filed for protection under Chapter 7 of the Bankruptcy Code on August 12, 2010. In his schedules, he listed $338,949.70 in total liabilities against only $12,850 in assets. Of the liabilities, $126,000 were priority debts for taxes, and the remainder were general unsecured debts. All of the debts were listed as business debt, business expenses or business loans. He listed his current monthly income as $0.

### III. DISCUSSION

A.   <u>No Actual Fraudulent Transfer</u>

11 U.S.C. § 548(a)(1)(A) authorizes a bankruptcy trustee to avoid any transfer of an interest in the debtor's property made within 2 years before the bankruptcy petition if the debtor made the transfer "with actual intent to hinder, delay, or defraud" another creditor. Illinois provides similar authority to avoid transfers made with actual fraudulent intent made within 4 years, under the Illinois Uniform Fraudulent Transfer Act. 740 ILCS 160/5. To prove a claim under either statute, a plantiff must show that "the main or only purpose of the transfer was to prevent a lawful creditor from collecting a debt." <u>In re Sentinel Mgmt. Group, Inc.</u>, 689 F.3d 855, 861-62 (7th Cir. Aug. 9, 2012).

Here, the Trustee failed to demonstrate that Bryan made any transfer to his ex-wife with any such intent. The Trustee provided no evidence that Bryan even considered creditors or the effect a transfer of property would have on them, either when agreeing that Gale could withdraw an extra $189,000 out of the house sale proceeds or when agreeing to the marital settlement agreement

Page 8 of 27

granting her an unequal distribution of marital property. Nor was there any indication that this was a 'sham' divorce. Instead, all the evidence showed that Gale and Bryan had legitimately divorced, and that both the decision to let Gale have an unequal distribution from the house sale proceeds and to let her keep those proceeds under the settlement agreement were based on Bryan's moral feeling that it had been unfair for him to invest $200,000 of his and his wife's retirement savings in his restaurant when she did not approve of such investment. Nor did the Trustee demonstrate that Bryan and Gale allocated exempt and non-exempt property between themselves in an attempt to shield assets from Bryan's creditors. While the end result of the division was that virtually all of the property allocated to Bryan could have been claimed as exempt, while Gale received a sizable bank account and equity in a vehicle that would have been non-exempt, there was no indication that this was done with creditors in mind. Instead, as mentioned previously, Bryan and Gale agreed to distribute property as they had separately held such property at the time of the dissolution. The evidence showed that Bryan happened to hold mostly exempt property at that time not because he was attempting to hoard exempt assets or in the midst of bankruptcy planning. Instead, he held mostly exempt property because he had already invested all of his non-exempt property into his restaurant because it was more liquid than his IRA. He had not funded his IRA recently, nor did the evidence show that he was keeping it because it was safer from creditors. Instead, it appears he used other sources of financing first to avoid the tax penalties for withdrawing funds early from the IRA. Indeed, even those tax disincentives did not ultimately stop him from pouring the rest of the IRA into his failing business - by the time he filed his bankruptcy petition, his schedules show that the IRA had been exhausted completely.

Evidence of fraudulent intent can also be inferred if a plaintiff demonstrates the existence of a sufficient number of "badges of fraud." See, e.g., Frierdich v Mottaz, 294 F.3d 864, 870 (7th Cir. 2002)(noting that badges "include: whether the debtor retained possession or control of the property after the transfer, whether the transferee shared a familial or other close relationship with the debtor, whether the debtor received consideration for the transfer, whether the transfer was disclosed or concealed, whether the debtor made the transfer before or after being threatened with suit by creditors, whether the transfer involved substantially all of the debtor's assets, whether the debtor absconded, and whether the debtor was or became solvent at the time of the transfer."); 740 ILCS 160/5(b) (listing factors including: "(1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."). Of these badges, the Trustee has only proved two: that the Gale was an insider or otherwise "shared a familial or other close relationship with the debtor," and that Bryan was insolvent. As will be discussed in the next section, the Trustee argued but failed to demonstrate that the transfer lacked reasonably equivalent

consideration. But even if the Trustee had demonstrated lack of consideration, the mere fact that the transfer was to his ex-wife and while insolvent would not have been enough without more to demonstrate actual fraud, particularly given Bryan's plausible explanation for the purpose of the transfer. Therefore, the Trustee failed to demonstrate that Bryan made any transfer with actual fraudulent intent.

B.     No Constructively Fraudulent Transfer

Under 11 U.S.C. §548(a)(1)(B), a bankruptcy trustee may avoid a transfer of an interest of the debtor in property within 2 years before the petition date if the debtor (i) "received less than a reasonably equivalent value in exchange for such transfer or obligation" and (ii) "was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation." 11 U.S.C. § 548(a)(1). A similar provision is available under the Illinois Fraudulent Transfer Act, but with a 4-year reach back. 740 ILCS 160/6(a).[4] These types of transfers are sometimes called "constructively fraudulent," since they require no fraudulent intent. The philosophy behind the statutory provisions is that "one should be just before being generous."[5] It is generally acceptable for a solvent individual to give away his property as gifts to whomever he pleases. But where such an individual is insolvent, the true economic interest being given away is his creditors' not his own. See, e.g., Bonded Fin. Servs., Inc. v. European Am. Bank, 838 F.2d 890, 892 (7th Cir. 1988) ("Fraudulent conveyance law protects creditors from last-minute diminutions of

---

[4]"A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." 740 ILCS 160/6(a).
[5]See, e.g., 5 Collier on Bankruptcy, ¶548.01, 548-10 (16th ed. Rev. 2010).

the pool of assets in which they have interests.").

i.  Transfer of an Interest in Property

The Court's first task is to identify exactly which transfer the Trustee seeks to avoid, since the Trustee actually described three transactions that could be considered transfers. The first two potential transfers are easily dealt with, while the third requires more extensive analysis.

a.  The First Transfer Was Made Beyond the Limitations Period or Otherwise does not Support an Avoidance Action

The first transfer was the unequal distribution and transfer of $189,300 in proceeds from the sale of the Kimmels' home out of the Kimmells' joint account.  Sometime in December 2007, Gale and Bryan discussed and agreed that Gale would receive this amount as compensation for Bryan's earlier use of their joint IRA funds, and the payment was actually made on December 31, 2007.  This date was more than 2 years before the petition date, and therefore would be outside the limitations period set forth in 11 U.S.C. §548(a)(1).  However, it was within 4 years of the petition date, and therefore could have been within the longer limitation period set forth in the Illinois Uniform Fraudulent Transfer Act. 740 ILCS 160/10.  A bankruptcy trustee can apply non-bankruptcy law to avoid a transfer under Section 544(b) of the Bankruptcy Code (the "Strong-Arm Clause"), but only if there is at least one actual unsecured creditor with an allowable claim that could assert such a claim.[6]  Under Illinois law a constructively fraudulent transfer may only be avoided by a creditor

---

[6]"[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502...." 11 U.S.C. §544(b)(1).

in existence at the time of the transfer, 740 ILCS 160/6(a), so the Trustee had to demonstrate the

existence of at least one unsecured creditor with an allowable claim as of the petition date that was

also in existence in December 2007.[7]  The Trustee need not specifically identify a creditor, so long

as the unsecured creditor exists.  Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide,

Ltd.), 139 F.3d 574, 577 (7th Cir. 1998).  But in this case no evidence was presented that any such

creditor exists.  Bryan's schedules to his bankruptcy petition did not list the dates any scheduled

debts were incurred, and while the Trustee presented some evidence that at least some of Bryan's

debts related back to March 2009, he presented no evidence that any scheduled debts related as far

back as December 2007. The Trustee therefore failed to demonstrate that the December 2007 transfer

was avoidable under the Strong-Arm Clause.  Additionally, even if the Trustee had had power to

assert a 740 ILCS 160/6(a) claim with respect to the December 2007 transfer, he failed to support

such a claim on the merits, since he provided no evidence to suggest that Bryan was insolvent as far

back as December 2007.

b.    The Assignment of Interest in Marital Property by Operation of Law was Clearly not for Less
than Reasonably Equivalent Value

The second potential transfer occurred by operation of law under the Illinois Marriage and

Dissolution of Marriage Act (the "Dissolution Act") upon the filing of the petition for dissolution

of marriage.  Illinois differs from states where spouses have current ownership interests in marital

---

[7]In contrast, the provision for fraudulent transfers with actual intent applies "whether the creditor's claim arose
before or after the transfer was made or the obligation was incurred." 740 ILCS 160/5(a).  As noted above,
however, the Trustee failed to demonstrate that Bryan acted with actual intent to hinder, delay or defraud creditors.

property even before a dissolution proceeding is commenced, such as community property states, and also differs from states where an ownership interest in marital property is only established upon an actual order by a divorce court. See, e.g., In re Ruhl, 474 B.R. 596, 599-600 (Bankr. N.D. Ill. July 2, 2012) (noting that under the Illinois Rights of Married Persons Act, 750 ILCS 65/1 to 22, spouses may have separate property interests even in property acquired post-marriage, at least until a marital dissolution action is filed). Instead, under the Illinois Dissolution Act, the filing of a petition for dissolution of marriage creates and vests a contingent interest of each spouse in all property of either spouse constituting "marital property." 750 ILCS 5/503(e) provides that in a dissolution of marriage proceeding, each "spouse has a species of common ownership in" marital property as defined in that statute "which vests at the time dissolution proceedings are commenced and continues only during the pendency of the action." This contingent interest ripens into a full ownership interest for any property distributed to such spouse when the divorce court enters an order of distribution or final judgment. In re Dzeilak, 435 BR. 538, 547 (Bankr. N.D. Ill. 2010). "Marital property" consists of all property acquired by either spouse subsequent to the marriage except for property falling within one of the specifically enumerated categories of "non-marital property" listed in 750 ILCS 5/503(a). Therefore, upon the filing of the petition for dissolution of marriage, Gale obtained a "species of common ownership" in all property that was previously Bryan's sole property to the extent that it constituted "marital property."

The definition of "transfer" under the Bankruptcy Code is potentially broad enough to encompass this type of transfer by operation of law, since it applies even to "indirect," "conditional,"

and "involuntary" modes of parting with interests in property.[8]  However, based on the facts in this

case, it is clear that the Trustee is not seeking to avoid this transfer. Gale was not ultimately granted

any property that Bryan individually owned as of the date the petition for dissolution was filed.

Instead, the Marital Settlement Agreement provided that each spouse could keep the property they

individually owned as of the time the divorce proceeding was commenced.  Moreover, since the

Trustee acknowledges that Gale and Bryan had unevenly allocated property between themselves in

favor of Gale before the divorce petition was filed, Bryan would have actually gained more by

obtaining an interest in Gale's individually held property than Gale would have obtained in Bryan's.

Therefore, even if the creation of an interest in marital property under 750 ILCS 5/503(e) could

constitute a transfer of property for purposes of 11 U.S.C. §548(a), Bryan received at least reasonably

equivalent value by gaining a similar interest in Gale's larger share of property.[9]

---

[8] The term "transfer" means-
(A) the creation of a lien;
(B) the retention of title as a security interest;
(C) the foreclosure of a debtor's equity of redemption; or
(D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with-
(i) property; or
(ii) an interest in property.
11 U.S.C. §101(54).

[9] The Court therefore need not determine at this time if a transfer by operation of 750 ILCS 5/503 could have been avoided under 11 U.S.C. §548(a) if Bryan had individually owned more assets than Gale at the time the petition for dissolution was filed and had been insolvent at that time. Some courts have held that because of the strong, traditional state interest in setting the terms of and procedures for marriage and divorce," courts should not read the avoidance provisions in 11 U.S.C. §548 to disturb allocations of property made pursuant to such state laws. Batlan v. Bledsoe (In re Bledsoe), 569 F.3d 1106, 1112 (9th Cir. 2009) (citing Attorney Gen. of N.Y. v. Soto-Lopez, 476 U.S. 898, 905 n. 5 (1986)); see also, e.g., Ingalls v. Erlewine (In re Erlewine), 349 F.3d 205, 212-13 (5th Cir. 2003) (expressing concern about "upset[ting] the finality of judgments in an area as central to state law as divorce decrees" at least where judgment resulted from fully litigated divorce proceedings); but see In re Bledsoe, 569 F.3d 1106, 1117-19 (9th Cir. 2009) (O'Scannlain, J., concurring) (arguing that rather than broadly holding that state divorce judgments should not be upset, the majority should have reached the same result by reasoning that the judgment was simply a determination of ownership rights under Oregon law rather than a "transfer" of property). Other courts, noting that the fraudulent transfer provisions in the Bankruptcy Code protect different interests and use a different standard than those normally involved in divorce proceedings, have found that 11 U.S.C. §548(a) can be used to avoid divisions of marital property under a judgment of dissolution or marital property settlement. See, e.g., Corzin

c.    <u>Trustee Seeks to Avoid the Transfer Made Pursuant to the Marital Settlement Agreement</u>

It is therefore clear that the only transfer the Trustee seeks to avoid is the transfer effected by the Marital Settlement Agreement, as incorporated into the judgment of dissolution. It is important to make this distinction because the issue is not a comparison between Bryan's rights in property pre-dissolution as against his rights under the settlement agreement. Indeed, in this case the settlement agreement essentially agreed to the division of property as it stood at the time the petition for dissolution was filed. Instead, the issue is whether Bryan gave up more property under the settlement agreement than he would have been entitled to receive under the Dissolution Act. Therefore, the transfer consisted of an exchange by Bryan and Gale of each parties' rights to distribution under the Dissolution Act in exchange for their respective rights under the Marital Settlement Agreement.

ii.    <u>The Debtor was Insolvent as of the Time of the Marital Settlement Agreement</u>

Insolvency is defined both by the Bankruptcy Code and the Illinois Uniform Fraudulent Transfer Act "as having a balance sheet on which liabilities exceed assets." <u>Baldi v. Samuel Son & Co., Ltd.</u>, 548 F.3d 579, 581 (7th Cir. 2008). This test has also been described as asking, "What would a buyer be willing to pay for the debtor's entire package of assets and liabilities?" - if that number is negative, the debtor is insolvent. <u>Id.</u>, 548 F.3d at 583. However, unlike a normal balance

---

v. Fordu (In re Fordu), 201 F.3d 693, 708 (6th Cir. 1999) (divorce courts "may take into account a number of equitable factors that conceivably could produce a division of marital property that would satisfy the requirements of Ohio Rev.Code Ann. § 3105.171(F), yet not pass muster under the reasonable equivalence test."); <u>Fogel v. Chevrie (In re Chevrie)</u>, Nos. 99-B-6542, 00-A-38, 2001 WL 120132 (Bankr. N.D. Ill. Feb. 13, 2001) (Sonderby, J.) (holding that allocation of property pursuant to a divorce decree is a 'transfer' of property that may be challenged by a bankruptcy trustee, and that principles of collateral estoppel and res judicata are not applicable since creditors are not parties to a dissolution of marriage proceeding).

Page 16 of 27

sheet, both the Bankruptcy Code and the Illinois Uniform Fraudulent Transfer Act exclude from the calculation any asset to the extent it may be claimed as exempt under state or federal law. 11 U.S.C. §101(32)(A)(ii) (excluding assets "that may be exempted from property of the estate under section 522"); 740 ILCS 160/2(b)(2) (excluding any asset "to the extent it is generally exempt under laws of this State").

Therefore, since Bryan gave up his right to all other property not provided for in the Marital Settlement Agreement, the question is whether the non-exempt assets granted to Bryan under that agreement exceeded his debts at that time. On the asset side, the $1,000 Suburu, the retirement accounts, and the small deposit accounts would have been exempt, and are therefore disregarded. See 735 ILCS 5/12-1001(c)($2,400 exemption in one motor vehicle); 11 U.S.C. §522(b)(C)(exemption for tax-qualified retirement funds); 735 ILCS 5/12-1001(b) (exemption of up to $4,000 in any other personal property). The parties agree that his interest in the energy consulting firm had no value. Therefore, the only non-exempt asset retained by Bryan that may have had value was his interest in the restaurant. The parties disputed the value of that interest, and also disputed the amounts of Bryan's debts as of the date of the settlement agreement.

The Trustee tried to show Bryan's debts by extrapolating backward from the debts listed in the schedules to his bankruptcy petition and by adding the debts listed in the 2009 balance sheets for Raising Kane Corp, subtracted by the value of the assets of the company. An initial problem with this method is that it may have resulted in some double counting of debts. The balance sheet included broad categories of debts, such as $91,000 for "mortgages, notes, and bonds payable in 1 year or more," and $27,727 for "other current liabilities," but no testimony was provided to give any

details about what those categories included and did not include. The testimony showed that
virtually all of the debts listed in Bryan's bankruptcy schedules were incurred in connection with the
restaurant, but there was no way to tell which of these debts may have also been included in the
corporation's balance sheet. Therefore, even though the Debtor gave testimony as to the size of the
scheduled debts as of March 2009, it was not appropriate, as the Trustee suggests, to simply add
them to the corporate debts listed on the balance sheet.

The balance sheet itself showed that as of January 2009, the corporation had sufficient assets
to pay the non-insider liabilities listed on the balance sheet, with as much as $13,682 in assets to pay
Bryan on his shareholder's loans.[10] The financial position of the company deteriorated by $109,850
by the end of 2009, largely because of additional debt. Bryan testified that the majority of additional
debts were incurred after the marital dissolution, but I find that at least $13,682 in debt was incurred
during the first three months of 2009, meaning that any right to distribution from the company was
of no value to Bryan as of the date of the settlement agreement. This means that he had no non-
exempt assets as of the end of March 2009.

Since Bryan had no non-exempt assets, even one dollar of debt would have made him
insolvent, and I find that to be the case. Bryan's testimony and schedules indicated that he was
personally liable on the vast majority of the business's third party debts. In addition, Bryan admitted
that among the personal debts listed in his bankruptcy schedules, $25,000 in tax liabilities and at
least $20,000 in personal credit card debt were incurred prior to March 2009. Therefore, whether

---

[10]This is not to say that a balance sheet prepared in accordance with generally applied accounting principles will
always be determinative as to value. But, here, little or no other evidence was presented to contradict the values
listed in the prepared balance sheet.

because of debts for which he was solely liable or for corporate debts for which he was jointly liable and in excess of the corporation's assets, I find that Bryan was insolvent as of March 31, 2009.

iii.     The Debtor Received Reasonably Equivalent Value Through the Marital Settlement Agreement

To determine reasonably equivalent value, whether under 11 U.S.C. §548 or under 740 ILCS 160/6, the proper test is "to determine the value of what was transferred and to compare it to what was received." Creditor's Comm. of Jumer's Castle Lodge v. Jumer, 472 F.3d 943, 947 (7th Cir. 2007). The burden of proving lack of reasonably equivalent value rests on the trustee. Barber v. Golden Seed Co., 129 F.3d 382, 387 (7th Cir. 1997). The formula "is not a fixed mathematical formula; rather, the standard for [r]easonable equivalence should depend on all the facts of each case, an important element of which is fair market value." Id. (internal citations omitted). Finally, since value need only be "reasonably equivalent," a "debtor need not collect a dollar-for-dollar equivalent to receive reasonably equivalent value." Id. (internal citations omitted). Under the Marital Settlement Agreement, Bryan exchanged his right to his non-marital property and to an equitable distribution of marital property under the Dissolution Act for his rights under the settlement agreement. Therefore, the Court must determine what Bryan's rights under the Dissolution Act were as of the time of the settlement, and compare the value of such rights to the value of the property he received under the Marital Settlement Agreement.

The Illinois Dissolution Act provides that a divorce court shall assign to each divorcing spouse his or her own non-marital property, and provides that the divorce court "shall divide the

marital property without regard to marital misconduct in just proportions considering all relevant factors." 750 ILCS 5/503(d). The statute goes on to set forth a non-exclusive list of factors a court may consider in its equitable determination, including: "(1) the contribution of each party to the acquisition, preservation, or increase or decrease in value of the marital or non-marital property, including the contribution of a spouse as a homemaker or to the family unit; (2) the dissipation by each party of the marital or non-marital property; (3) the value of the property assigned to each spouse; (4) the duration of the marriage; (5) the relevant economic circumstances of each spouse when the division of property is to become effective, including the desirability of awarding the family home, or the right to live therein for reasonable periods, to the spouse having custody of the children; (6) any obligations and rights arising from a prior marriage of either party; (7) any antenuptial agreement of the parties; (8) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of each of the parties; (9) the custodial provisions for any children; (10) whether the apportionment is in lieu of or in addition to maintenance; (11) the reasonable opportunity of each spouse for future acquisition of capital assets and income; and (12) the tax consequences of the property division upon the respective economic circumstances of the parties." 750 ILCS 5/503(d). "The touchstone of proper apportionment is whether it is equitable, and each case rests on its own facts." In re Marriage of Romano, 968 N.E.2d 115, 150 (Ill. App. Ct. Mar. 21, 2012). "An equitable division does not necessarily mean an equal division, and one spouse may be awarded a larger share of the assets if the relevant factors warrant such a result." Id., 968 N.E.2d at 150-51 (finding that under the circumstances, a 23% / 77% division of marital property was not an abuse of discretion).

The fact that a divorce court apparently approved the Kimmells' settlement does not establish that the property granted under the settlement agreement was equal in value to the rights of the parties under the Dissolution Act.  The Illinois Dissolution Act encourages settlements, and an Illinois divorce court will only refuse to approve a settlement agreement if the court finds it to be unconscionable, not if it merely finds the division to be inequitable.[11]  Even if the approval by the divorce court could be seen as a determination that the agreement was equitable as between the spouses, the solvency of each spouse or the interests of the spouses' creditors are not likely to be known or of primary concern to the divorce court.  Therefore, the fact that a divorce court approved the settlement does not necessarily mean that the rights under the settlement were equivalent in value to the parties' rights under the Dissolution Act. Fogel v. Chevrie (In re Chevrie), 2001 WL 120132 (Bankr. N.D. Ill. Feb. 13, 2001) (judicial approval of marital settlement agreement "does not represent a determination that the agreement perpetrates no fraud upon the creditors of one spouse, particularly where the claims of creditors are not made known to the court or provided for in the decree.") (citing Kardynalski v. Fisher, 482 N.E .2d 117, 122 (Ill. App. Ct. 1985)).

Because a divorce court had not made any determination as to the Kimmells' rights under the Dissolution Act as of the time they entered into the Marital Settlement Agreement, there was uncertainty at that time as to how a hypothetical court would rule. By means of the settlement agreement, Bryan and Gale agreed to a specified and determined allocation of property in exchange for giving up their respective rights to an unknown result of potential litigation.  This uncertainty

---

[11]The Illinois Marriage and Dissolution Act expressly states that it promotes amicable settlement of disputes by making agreements providing for the disposition of property or for maintenance binding on the divorce court (other than provisions providing for the support, custody and visitation of children) unless the court finds that the agreement is unconscionable.  750 ILCS 5/502.

affected the value of that right. Therefore, in valuing that right, this Court cannot simply decide how it would have decided the matter if presented before this Court, but rather must consider the range and likelihoods of potential litigation outcomes before a divorce court. Therefore, the analysis is similar to the analysis used in determining whether settlements of litigation are fair and reasonable in other contexts. For example, in the context of motions to approve settlements under Rule 9019 of the Bankruptcy Rules, the Seventh Circuit Court of Appeals has noted that it is often rational for parties "to forego the uncertainty of litigation" and that the appropriate standard in determining if a settlement is in the best interest of the estate is if the settlement terms are "within 'the reasonable range of possible litigation outcomes.'" In re Holly Marine Towing, Inc., 669 F.3d 796, 802 (7th Cir. Jan. 6, 2012); see also In re Doctors Hosp. Of Hyde Park, Inc., 474 F.3d 421, 426 (7th Cir. 2007) (stating that in Rule 9019 context, the "reasonable equivalence standard is met if the settlement falls within the reasonable range of possible litigation outcomes."). Additionally, settlement can avoid costs required to fully litigate a matter, including additional attorneys' fees, which would otherwise decrease the value obtained in enforcing a right to property. Therefore the comparison is not strictly against what this Court believes was an appropriate distribution under the Dissolution Act, but whether the settlement was within the reasonable range of possible litigation outcomes, with due consideration to the costs of litigation. In re Doctors Hosp., 474 F.3d at 431 (in Rule 9019 context "the bankruptcy court considers the litigation's probability of success, complexity, expense, inconvenience, and delay, including the wasting of assets that comes from extended litigation."). It is true that these cases did not deal with the standard of "reasonably equivalent value" under 11 U.S.C. §548, but even in that context, the Court of Appeals has indicated that courts should be

cognizant of the full circumstances surrounding the value of an asset. Thus, the court held that it is inappropriate to look at the full book value of an account receivable in determining reasonably equivalent value where the evidence is clear that there is "little to no likelihood" that the account debtor would ever repay the debt. Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer, 472 F.3d 943, 948 (7th Cir. 2007).

Here, the Trustee failed to demonstrate that the division of property in the marital settlement agreement was less favorable to Bryan (and Bryan's creditors) than a fully litigated divorce would have been, considering the likelihood and range of potential litigation outcomes and considering the costs involved. There are many reasons that a divorce court could have granted Gale a greater distribution of property. First, Gale presented evidence at trial that the $11,000 Vanguard account was her own non-marital property, and therefore would not have been considered in the division of marital property. Second, the evidence showed that during the large majority of their lengthy marriage of over 25 years, Bryan was the primary income earner, and yet Gale had agreed to waive any right to maintenance. Additionally, while Bryan was not currently employed in the financial markets, the evidence showed that he had a greater potential to earn income based on his experience and credentials. Also, a divorce court may have considered the history of Bryan's investment in the restaurant. The Trustee argues that the investment did not constitute "dissipation of marital assets" under the Illinois Dissolution Act because Gale was aware of the investment and because Bryan made the investment in the legitimate hopes that the restaurant would be successful and benefit both spouses rather than for his sole benefit. See, e.g. In re Marriage of Romano, 968 N.E.2d 115, 139 (Ill. App. Ct. Mar. 21, 2012) ("Our supreme court has defined dissipation as used in section 503(d)

to mean 'the use of marital property for the sole benefit of one of the spouses for a purpose unrelated to the marriage at a time that the marriage is undergoing an irreconcilable breakdown.'") (citing In re Marriage of O'Neill, 563 N.E.2d 494 (Ill. 1990)).  However, even if a divorce court concluded that the investment did not formally constitute dissipation, that does not mean that the court would have ignored the history altogether.  A divorce court may have considered the investments Bryan made into the restaurant as evidence tending to show the restaurant's value.  This includes not only the $200,000 taken out of the IRA but also significant investments out of Bryan's share of the house sale proceeds and money he borrowed.  Without the guidance of hindsight, the court, like Brian, may have had higher expectations as to the prospects and current value of the restaurant in March 2009. Bryan's history of investments in the restaurant, and the fact that he had also formed an energy consulting firm, also may have convinced a divorce court that he had "reasonable opportunit[ies] for future acquisition of capital assets and income." 750 ILCS 5/503(d).  Additionally, Bryan testified that at the time of the divorce, he believed he was entitled to a pension from a former employer worth around $74,000 and that he was entitled to keep under the settlement agreement.  While he subsequently learned that he had not met the vesting requirements for that pension, at the time of the divorce a divorce court may have considered this as a 'reasonable opportunity for future income' as well.  Based on the evidence presented, I cannot say that a reasonable person in Bryan's position, even one with his creditors' best interests at heart, would not have agreed to the distribution set forth in the Marital Settlement Agreement after considering all the circumstances.

The Trustee also seems to argue that the transfer was not for reasonably equivalent value because it was not a 50/50 division of marital property.  There is, in fact, some support for this

argument.  But I believe that case law is wrongly reasoned or else distinguishable on the facts.  In Gronchocinski v. Knippen (In re Knippen), 355 B.R. 710 (Bankr. N.D. Ill. 2006), a case affirmed on appeal to the District Court, 2007 WL 1498906 (N.D. Ill. May 18, 2007), the court found that a division under a marital settlement agreement was a transfer not for reasonably equivalent value because the division was unequal.  The court found that because the debtor's ex-wife received a house with equity of $57,000 while the debtor only received property worth $8,500, the transfer was fraudulent to the extent the debtor's one-half interest in the equity in the house pre-transfer, $28,500, exceeded the $8,500 he received under the agreement.  I disagree with the reasoning in Knippen, and feel the court strayed by failing to identify precisely the transfer at issue.  The court compared the property given to the ex-wife under the settlement agreement with the property given to the debtor under the same agreement and asked if they were reasonably equivalent.  But as discussed above, the true question should have been whether the debtor's rights under the settlement agreement were reasonably equivalent to his rights under the Illinois Dissolution Act.  Since the Dissolution Act does not provide for an equal distribution, there is no reason to compare the rights under a settlement agreement to an equal division.  Perhaps the court in Knippen was combining the transfer effected by the creation of the ownership right in marital property under 750 ILCS 5/503(e) with the transfer effected by the settlement agreement, and therefore comparing the property of each spouse prior to the filing of the dissolution action with the property of each spouse granted under the marital settlement agreement.  But again, there is no logical reason to assume that pre-dissolution the spouses in Knippen would have held equal interests in property.  Illinois is not a community property state, and under the Illinois Rights of Married Persons Act, 750 ILCS 65/1 to 22, spouses may have

separate property interests. Perhaps in <u>Knippen</u> the spouses happened to hold all property in tenancy in common,[12] meaning that they would have each held undivided 50% interests in all property, but that still does not explain why the court would have treated the full $8,500 in property granted under the settlement agreement to the debtor as consideration granted to him, rather than only the $4,250 in value that would have constituted his wife's 50% interest.  In any event, in this case it was clear that Bryan and Gale did not hold their property in tenancy in common, and there was no reason to suggest a proper division under the Illinois Dissolution Act would have been 50/50.

iv.    Conclusion

Since the Trustee failed to demonstrate that Bryan made a transfer for less than reasonably equivalent value, the Trustee has failed to prove a claim under either 11 U.S.C. § 548(a)(1)(B) or the substantially similar 740 ILCS 160/6.

## IV.  CONCLUSION

The Trustee having failed to demonstrate that the Debtor made a fraudulent transfer to his ex-wife, judgment shall be entered in favor of the Defendant on all counts.

The foregoing constitutes findings of fact and conclusions of law as required by <u>Fed. R. Civ.</u>

---

[12]The opinion mentioned that the house was owned in joint tenancy, 355 B.R. at 718, which pursuant to the Illinois Joint Tenancy Act, would have converted to a tenancy in common upon the judgment of dissolution of marriage unless otherwise directed by the divorce court. 765 ILCS 1005/1c. But, the opinion stated that the $5,000 vehicle distributed to the debtor was co-owned by the debtor and his father, and made no reference to the nature of ownership of the other vehicles totaling $3,500 that were distributed to the debtor under the marital settlement agreement or to the nature of ownership of the other assets the ex-wife was entitled to keep. 355 B.R. at 724.

P. 52(a) and Fed. R. Bankr. P. 7052.   A separate order shall be entered giving effect to the

determinations reached herein.

DATE: October 12, 2012

The Honorable Manuel Barbosa
United States Bankruptcy Judge